UNITED STATES of America,

v.

Esteban GONZALEZ, Defendant.

No. 94 CR. 134(WK).

United States District Court, S.D. New York.

Sept. 25, 2003.

Jeremy H. Temkin, Mary Jo White, U.S. Atty. Criminal Div., New York City, for U.S.

George R. Goltzer, Goltzer & Adler, New York City, Alexander Eisenmann, Law Office of Alexander Eisenmann, New York City, Frank Handelman, New York City, for defendant.

## OPINION & ORDER

WHITMAN KNAPP, Senior District Judge.

### INTRODUCTION

In September 1999, Alexander E. Eisemann, counsel for the defendant, indicat-ed that he would move for a new trial on behalf of his client pursuant to Fed. R.Crim.P. 33. He was ordered to file such a motion by October 9, 1999; on defendant's request, the time in which to file was extended to October 12, 1999. (Docket No. 72.) The relevant documents—which included only a Notice of Motion, a Declaration of Alexander E. Eisemann ("Eisemann Decl."), and a Supplemental Declaration of Alexander E. Eisemann ("Supp'l Eisemann Decl.")—were filed on October 15, 1999. The Notice of Motion indicates that, pursuant to Rule 33, the defendant seeks an order (1) setting aside the jury's verdict; (2) granting him a new trial; (3) granting him an evidentiary hearing to develop the underlying facts, (4) permitting him to amend and supplement his motion in light of further discovery, further review of existing materials and evidence developed during an evidentiary hearing; and (5) granting such other relief as the Court may deem just and proper.

The Eisemann Decl. proposed, however, that if the government opposed the filing as untimely under Rule 33, and if the Court agreed that the motion is indeed untimely under Rule 33, that the filing be deemed a petition for habeas corpus under 28 U.S.C. § 2255.[1] On April 21, 2003, Eisemann filed "Defendant's First Amended and Supplemental Application to Vacate His Conviction" ("Amended and Supp'l Application to Vacate") along with a "Declaration of Alexander Eisemann" ("Eisemann Decl. II"). The purpose of these later filings is "(a) to refine the allegations already made to conform them to proof already in the record, (b) to eliminate earlier allegations and arguments that defendant has elected to abandon and (c) to raise

---

**1.** In a letter dated July 18, 2003, Mr. Eisemann informed the Court that the defendant seeks relief not only pursuant to 28 U.S.C. § 2255, but also pursuant to Fed.R.Crim.P. 33 and 28 U.S.C. § 2241.

additional allegations that defendant intends to establish with evidence obtained through subpoenas..." (Eisemann Decl. II ¶ 3.) The current application seeks the same relief as the first application filed in October 1999.

In support of his motion, the defendant argues that his trial attorney, Pasquale "Pat" V. Stiso ("Stiso"), provided ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Specifically, the defendant charges that at the time of his representation at the trial of this case in 1994, unbeknownst to the defendant, both he and Stiso were members of a violent drug organization (the "Maisonet Organization") led by Francisco Maisonet ("Maisonet"). The defendant charges that his attorney's involvement in the Maisonet Organization at the time of his trial amounts to a per se violation of his Sixth Amendment right to effective assistance of counsel on the grounds that both the defendant and his attorney were engaged in the same criminal conduct. *See United States v. Fulton* (2d Cir.1993) 5 F.3d 605. Moreover, the defendant charges that Stiso's paramount loyalty was to Maisonet, as head of the Organization, rather than to his client, resulting in an actual conflict of interest. *See Winkler v. Keane* (2d Cir.1993) 7 F.3d 304, 307 ("An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.")(internal quotation marks omitted.)

Additionally, the defendant alleges a number of specific failures by Stiso which, he claims, amount to ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Gonzalez charges that

Stiso was ineffective in that he: (2) failed to obtain material and favorable evidence about law enforcement witnesses prior to trial (*id.* ¶¶ 35–45); (3) failed to obtain and/or elicit evidence contradicting the government's allegation that the defendant had been burglarizing an apartment in the area in which he was allegedly seen with a gun (*id.* ¶¶ 52–62); (4) failed to elicit exculpatory ballistics and other forensic evidence (*id.* ¶¶ 63–72); (5) agreed not to call an Assistant United States Attorney as a witness at trial, but instead allowed his testimony in the form of a declaration (*id.* ¶¶ 73–78); (6) that he presented an incredible defense (*id.* ¶¶ 79–81); (7) that he failed to question witnesses in a certain manner (*Id.* ¶¶ 82–84). Finally, the defendant alleges that, following the defendant's decision to pursue the instant action, Stiso violated his duty of loyalty to the defendant as a former client in various respects; that he has perjured himself; and that he has obstructed justice. (Eisemann Decl. II ¶¶ 105–108).

The defendant also alleges that the government failed to turn over certain evidence about law enforcement witnesses and failed to investigate those same witnesses in violation of *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and *Giglio v. United States* (1972) 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. (Eisemann Decl. II ¶¶ 46–51). Finally, the defendant alleges that he has newly discovered evidence that demonstrates that Detective Thomas Crowe ("Crowe"), the government's central witness, has a "habit" of fabricating evidence against defendants in criminal cases. (Eisemann Decl. II ¶¶ 85–104). None of the allegations set forth in this paragraph are properly before the Court because they are not the subject of this hearing. I have repeatedly ruled that this evidentiary hearing was limited "to the question of whether Pat V. Stiso had become involved

in Francisco Maisonet's criminal activities prior to our trial in this case." (Mem. to Counsel of Sept. 28, 2000). *See also* Order of May 19, 2003.

For the reasons that follow, I conclude that the defendant has not submitted sufficient credible evidence to demonstrate (1) that Stiso had become involved in Maisonet's criminal activities prior to the defendant's trial in October 1994; (2) that Stiso was involved in the criminal activity for which Gonzalez was convicted; (3) that Stiso labored under divided loyalties between the defendant and Maisonet with respect to Gonzalez' representation in this case constituting an actual conflict of interest with Gonzalez; (4) that Stiso's representation of the defendant fell below "an objective standard of reasonableness" *Strickland v. Washington* (1984) 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674; (5) that there exists a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, defendant's motion for a new trial under Fed. R.Crim.P. 33 or for relief under 28 U.S.C.

§ 2255 or 28 U.S.C. § 2241 must be DENIED.[2]

## BACKGROUND

### Procedural History

I presided over the jury trial of Esteban Gonzalez ("Gonzalez" or "defendant") and his co-defendant in 1994, Alfredo Colon ("Colon"), on charges of possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). After a finding of guilty, Gonzalez, who was subject to the enhanced penalty provisions of 18 U.S.C. § 924(e) because of his prior record, was sentenced to 180 months imprisonment and a five-year term of supervised release. Colon was sentenced to 92 months imprisonment, followed by three years of supervised release. Gonzalez' sentence represented a downward departure from a Guidelines sentence range of 235 to 294 months. At sentencing, no reason for the departure was articulated. (1/11/96 Tr. ("Sent.Minutes") at 27). For this reason, Gonzalez' sentence was vacated on appeal.[3]

**2.** Defendant's motion under Rule 33 of the Federal Rules of Criminal Procedure is, nevertheless, untimely. Rule 33 requires that new trial motions (based on grounds other than newly discovered evidence) or requests for extensions be made within seven days after verdict. The seven-day time limit is jurisdictional and may not be extended by the court after the seven-day period expires. *See, e.g., United States v. Dukes* (2d Cir.1984) 727 F.2d 34, 38; *United States v. Mayo* (2d Cir. 1994) 14 F.3d 128, 132. Defendant's trial counsel requested an extension of time within which to file a motion for a new trial by letter dated November 28, 1994, a full 27 days after the verdict of guilty was returned by the jury against the defendant. Accordingly, were defendant's motion under Rule 33 not denied on the merits, it would be dismissed as untimely.

**3.** In a March 2000 letter to Assistant United States Attorney Richard Owens, the defendant

alleged that I "intentionally created the sentencing error after granting the [downward] departure because [I] thought [the defendant's] conviction would be reversed on appeal." (Letter from Gonzalez to Owens of March 16, 2002 at 1). The allegation is completely false. Gonzalez also alleges that I told Mr. Owens to tell Stiso, the defendant's trial attorney, that if the defendant appealed his conviction, the government would cross-appeal the sentence. Again, this allegation is false. I did indeed have an ex parte communication with Mr. Owens, in which I suggested that the government agree to waive its appeal from the downward departure if the defendant agreed to waive his appeal from the conviction. I instructed Mr. Owens to communicate this suggestion to Mr. Stiso, which I understood him to do. The suggestion was made *after* I sentenced the defendant and was not part of a larger scheme to harm the defendant. As I stated at the sentencing, I only decided to depart downwardly after

Both defendants appealed the judgment of conviction on the grounds that: (1) the evidence was insufficient to sustain their convictions; (2) certain evidence was improperly admitted; (3) statements made by two police officers were improperly withheld from defense counsel in violation of the government's obligations under both the Jencks Act, 18 U.S.C. § 3500 *et seq.*, and *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; and (4) certain jury instructions were erroneous. *See United States v. Gonzalez* (1997) 110 F.3d 936. The government cross-appealed Gonzalez' sentence, arguing that the downward departing from the Guidelines' recommendation without providing any permissible reason for doing so was in error. *Id.* The Second Circuit agreed with the government, vacating Gonzalez' sentence and remanding for re-sentencing.[4] *Id.* In addition, the Second Circuit affirmed the judgment of conviction against both defendants, "easily conclud[ing]" that the evidence against both defendants was sufficient. *Id.* Indeed, it was overwhelming. The facts of the underlying crime and the ensuing trial are set forth in detail in the Second Circuit's opinion; accordingly, I presume familiarity. *See id.* at 939–940.

*Gonzalez' Post-conviction Counsel*

In May 1997, following the outcome of the defendant's appeal, the defendant wrote to me indicating that he wished to have Stiso removed and new counsel appointed due to a conflict of interest between the lawyer and his client. (Letter from Gonzalez to the Court of May 29,

1997). On June 3, 1997, I received a letter from Assistant United States Attorney Owens which stated that a woman identifying herself as the defendant's sister had contacted him by telephone. (Letter from Owens to the Court of June 3, 1997). On July 3, 1997, a conference was held before the Court wherein Stiso advised the Court that although he had been retained, the defendant no longer had any funds with which to pay his attorney fees and that he had not been paid since "about halfway" through the trial. (Order of July 10, 1997.) Since neither client nor attorney wished to continue the relationship, Stiso was relieved because Gonzalez had apparently made colorable allegations about Stiso's conflict of interest, I found that the interests of justice required the appointment of new counsel. (*Id.*) On July 11, 1997, Stuart Holtzman, who was not at that time a member of the Criminal Justice Act ("CJA") Panel, but had been in the past, was appointed. (Docket No. 64.) In December 1997, I received the first of many letters from the defendant in which he complained about the quality of his representation by the various CJA lawyers appointed to represent him over the course of this proceeding. *See e.g.*, Letter from Gonzalez to the Court received May 4, 1999 (Mr. Eisemann's representation); Letter from Gonzalez to the Court of June 22, 2000 (same); Letter from Gonzalez to the Court received Oct. 16, 2001 (same); Letter from Gonzalez to the Court of Sept.

---

hearing from the very attorney that the defendant now contends was ineffective. (*See* 1/11/96 Tr. at 26 ("The Court: At least you have proved your good judgment in keeping Mr. Stiso, because I had decided not to depart downward, but I will depart downward to 15 years...")). Contrary to what the defendant may believe, my suggestion was a perfectly ethical one and not one designed to deprive

him of any right guaranteed him under the Constitution. My suggestion to Mr. Owens neither "causes a dark stain on the integrity of the judicial system" nor should it give "life to conspiracy theories of Oliver Stone proportions." (Letter from Gonzalez to Owens of March 16, 2002 at 2–3).

**4.** To date, Gonzalez has not been resentenced.

4, 2002 (Mr. Handelman's representation); Letter from Gonzalez to the Court of Oct. 10, 2002 (conduct of Mssrs. Handelman, Goltzer); Letter from Gonzalez to the Court of Jan. 10, 2003 (Mr. Eisemann's representation); Letter from Gonzalez to the Court of July 8, 2003 (same). In response to the defendant's complaints about Mr. Holtzman, the Court explained to the defendant that "I persuaded Mr. Holtzman to represent [him] because I have known [Mr. Holtzman] for many years and consider him to be one of the most competent and thoughtful attorneys presently available." (Letter from the Court to Gonzalez of Dec. 18, 1997). Following this exchange, the defendant came to share my view of Mr. Holtzman's abilities as an advocate. Shortly thereafter, Mr. Holtzman died suddenly.

In his stead, George Goltzer, a CJA attorney assigned to receive cases was appointed. The defendant concluded that Mr. Goltzer also provided unsatisfactory representation and on January 15, 1999, he was relieved.[5] I then appointed Mr. Eisemann, who remains Mr. Gonzalez' attorney on the motion for a new trial or for relief under 28 U.S.C. § 2255 or § 2241.[6] The defendant's representation by Mr. Eisemann has not always been satisfactory to the defendant, as evidenced by various letters to the Court over the years since Mr. Eisemann was appointed. Recently, Gonzalez' accusations of conflict of interest against Mr. Eisemann prompted Mr. Eisemann to request that the Court conduct a Curcio hearing. (Tr. of Hr'g of May 21, 2003.) The Court conducted the Curcio hearing and the defendant stated that he wished to continue to be represented by Mr. Eisemann. (*Id.*)

*Stiso's Conviction*

On August 12, 1998, Stiso pled guilty to a four-count Superseding Information, S5 97 Cr. 817(DC), filed in this district. (Exhibit 3501–H ("Stiso Plea Transcript")). Count One charged Stiso with participating in Maisonet's narcotics trafficking conspiracy, between October 1996 through August 1997. (Exhibit 3501–F ("Stiso Information"), ¶¶ 1–3). Stiso's participation in the conspiracy involved holding, for safekeeping on behalf of Maisonet, approximately $250,000 in cash profits from Maisonet's narcotics trafficking which Maisonet's girlfriend began delivering to Stiso's office in May 1997. (Stiso Information ¶ 3; Gvt. Ex. 3501–I ("Stiso PSR"), ¶¶ 14, 43; 1/14/03 Tr. at 4–8). Counts Two and Three charged Stiso with obstruction of justice, in violation of 18 U.S.C. § 1503. (Stiso Information ¶¶ 4–5). Specifically, in November 1996, Stiso disclosed the identity of a cooperating witness to Maisonet, in violation of an explicit court order not to divulge the witness's identity. (Stiso PSR ¶¶ 44—55). Subsequently, in January

---

5. Mr. Goltzer moved to withdraw as counsel and Mr. Gonzalez concurrently moved for appointment of new counsel.

6. In May 2002, Mr. Eisemann requested that separate counsel for Gonzalez' re-sentencing be appointed in order to expedite both the re-sentencing and the present action and allow Eisemann to focus on the present motion. (Letter from Eisemann to the Court of May 28, 2002.) I agreed and on June 5, 2002, appointed Frank Handelman. In September 2002, Mr. Handelman requested that he be relieved, stating that it was not possible for him to work effectively with the defendant. This sentiment was echoed by the defendant in letters to the Court throughout September and October, where he accused Mr. Handelman of "attempting to undercut, undermine and obstruct [his] access to the court by refusing to raise meritorious factual and legal issues." (Letter from Gonzalez to the Court of Oct. 10, 2002.) On October 17, 2002, I heard from Mr. Handelman, Mr. Eisemann, and from the defendant on this matter. (*See* 10/17/02 Conf. Tr.). Mr. Handelman was relieved and Michael A. Young was appointed to represent the defendant on his re-sentencing.

1997, Stiso lied to now-Chief Judge Mukasey about the scope of his then-ongoing representation of Maisonet. (*Id.* ¶¶ 56–57). Count Four charged Stiso with conspiracy to commit obstruction of justice for participating in a scheme with Cesar Agramonte (a client unrelated to the Maisonet Organization) to obtain bail through false pretenses and to manufacture "cooperation" which Agramonte could then offer to the government. (Stiso Information ¶¶ 6–9; Stiso PSR ¶¶ 58—77). Stiso's criminal involvement with the Agramonte scheme lasted from approximately July 1996 through the Fall of 1996. (Stiso PSR ¶¶ 75–77).

### The Evidentiary Hearing

In spite of the fact that the Second Circuit "*easily* conclude[d] that the evidence against both defendants was sufficient," the Court granted Gonzalez' motion for an evidentiary hearing on matters concerning his representation at trial since Stiso had subsequently been convicted of crimes arising from his involvement with the Maisonet Organization. From the start, it has been undisputed that Stiso was involved in the criminal activities of the Maisonet Organization. The question at issue is when that involvement began. The purpose of this hearing was to determine whether or not Stiso's involvement began prior to or during the defendant's trial and, if so, whether or not that involvement resulted in the ineffective assistance of counsel that the defendant claims. In October 2000, the defendant's request for an evidentiary hearing to develop the facts to support his claims was granted. (10/10/00 Tr. at 1). In addition to the defendant and Stiso, eight witnesses testified, including five former members of the Maisonet Organization (now in prison), one witness who came to know the defendant

in a Bureau of Prisons facility, an Assistant United States Attorney involved in the investigation and prosecution of Stiso, a former Corrections Officer (now a Drug Enforcement Agency Agent) who worked in a facility which housed both Gonzalez and Stiso, and the individual whose home was the subject of an attempted burglary on the night the defendant was arrested and charged with the underlying crime. This case has occupied my attention for much of the last six years.

## LEGAL STANDARDS

### Ineffective Assistance of Counsel Under Strickland v. Washington

█ Generally, in order to prevail on an ineffective assistance of counsel claim, a defendant must establish both that his counsel performed deficiently and that the deficiency caused actual prejudice to his defense. *Strickland v. Washington* (1984) 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Under the first prong, the court must "indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The defendant may prove the deficiency prong by establishing that his attorney's conduct fell "outside the wide range of professionally competent assistance," *id.* at 690, 104 S.Ct. 2052, and establish prejudice by showing a "reasonable probability" exists that, but for the deficiency, "the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial..." *Dunham v. Travis* (2d Cir.2002) 313 F.3d 724, 730 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).[7]

---

**7.** Some circumstances are so egregious that they "are so likely to prejudice the accused

that the cost of litigating their effect in a particular trial is unjustified". *United States*

The Second Circuit has instructed that a reviewing court should be "highly deferential" to counsel's performance because " 'it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." ' *Pratt v. Greiner* (2d Cir.2002) 306 F.3d 1190, 1196 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Although the *Strickland* test for ineffective assistance of counsel contains two prongs, the Supreme Court has specifically noted that the federal district courts need not address both components if a defendant fails to establish either one. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.*

In granting the defendant's request for an evidentiary hearing, the scope of that hearing was specifically limited to the question of Stiso's involvement in the Maisonet Organization at the time of Gonzalez' trial because I did not believe, based on his submissions, that Gonzalez had presented a credible claim of ineffective assistance of counsel under *Strickland v. Washington.* In spite of this limitation, the defendant has included in his motion papers claims for relief under *Strickland* (Eisemann Decl. II ¶¶ 27–45, 52–84, 121–125). Ac-cordingly, I will rule on these claims as well as those that were the direct subject of this hearing. For the reasons set forth below, I find that the defendant cannot show *either* that Stiso's representation at trial was deficient or that he suffered any prejudice as a result of Stiso's representation. The defendant's claim for relief on the grounds that Stiso provided ineffective assistance of counsel under *Strickland v. Washington* are, therefore, denied.

*Per Se Conflict of Interest*

■ "A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Blau* (2d Cir.1998) 159 F.3d 68, 74; *see also Wood v. Georgia* (1981) 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220; *United States v. Schwarz* (2d Cir.2002) 283 F.3d 76, 91; *Armienti v. United States* (2d Cir. 2000) 234 F.3d 820, 823. "A claim of ineffective assistance of counsel predicated on an alleged conflict between client and attorney falls into one of two categories: a *per se* violation of the Sixth Amendment; or a conflict that does not rise to the level of a *per se* violation but may nonetheless jeopardize the representation." *United States v. Luciano* (2d Cir.1998) 158 F.3d 655, 661. "There is an 'actual or constructive denial of the assistance of counsel,' *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052,

*v. Cronic* (1984) 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657. These circumstances have been narrowly construed by the Supreme Court. *See Strickland*, 466 U.S. at 692, 104 S.Ct. 2052 (absence or denial of counsel at a critical stage of a criminal proceeding); *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039 (same); *Burdine v. Johnson* (5th Cir.2001) 262 F.3d 336 (en banc) (where counsel slept repeatedly during guilt-innocence phase of capital trial, he was absent at a critical stage within meaning of *Strickland* and *Cronic* ) *cert. denied* 535 U.S. 1120, 122 S.Ct. 2347, 153 L.Ed.2d 174 (2002) (Mem.). In addition to the absence or denial of counsel at a criti-cal stage, the Supreme Court in *Cronic* identified three other circumstances in which a presumption of prejudice would be required to ensure the fairness of a proceeding: (1) "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" (2) "when although counsel is available during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial;" and (3) "when counsel labors under an actual conflict of interest." *Cronic*, 466 U.S. at 659–60, 662 n. 31, 104 S.Ct. 2039.

and, as such, a *per se* violation of the Sixth Amendment in two limited circumstances: where defendant's counsel was unlicensed, and when the attorney has engaged in the defendant's crimes." *United States v. Fulton* (2d Cir.1993) 5 F.3d 605, 611 (citations omitted).

The defendant alleges that a *per se* conflict of interest existed between Stiso and himself because Stiso had engaged in the defendant's crimes—namely the furtherance of the unlawful goals of the Maisonet Organization. (Eisemann Decl. II at ¶¶ 16–26, 110–113). With respect to conflicts falling within the *per se* category of conflicts the Second Circuit has held that:

> [T]here is an "actual or constructive denial of the assistance of counsel," *Strickland*, 466 U.S. at 692, and, as such, a *per se* violation of the Sixth Amendment in two limited circumstances: where defendant's counsel was unlicensed, and when the attorney has engaged in the defendant's crimes. *See, e.g., Bellamy v. Cogdell* (2d Cir.1992) 974 F.2d 302, 306 (en banc); *United States v. Novak* (2d Cir. 1990) 903 F.2d 883, 890 ("unlicensed" counsel); *United States v. Cancilla* (2d Cir.1984) 725 F.2d 867, 870 (implicated in crimes); *Solina v. United States* (2d Cir.1983) 709 F.2d 160, 168–69 ("unlicensed" counsel).

The *per se* rule applies when an attorney is implicated in the crimes of his or her client since, in that event, the attorney cannot be free from fear that a " 'vigorous defense should lead the prosecutor or the trial judge to discover' " evidence of the attorney's " 'own wrongdoing.' " *Bellamy*, 974 F.2d at 307 (quoting *Solina*, 709 F.2d at 164). Of course, the *per se* rule does not apply any time a court learns that an attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged

crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised. *United States v. Fulton* (2d Cir.1993) 5 F.3d 605, 611.

■ The *per se* rule set forth in *Fulton* is only invoked, however, where the attorney's criminal activity is closely related to the charged crimes of the defendant. Where the attorney's criminal conduct "involves a completely different substantive crime and is factually and temporally distinct" from the client's conduct, the *per se* rule does not apply. *United States v. Levy* (2d Cir.1994) 25 F.3d 146, 157 n. 8 (finding counsel's criminal involvement in bail jumping by client's co-defendant not sufficiently related to invoke *per se* rule). Because the defendant has not shown (1) that his illegal activities on February 24, 1994 were Maisonet-related or (2) that Stiso was involved in the criminal activities of the Maisonet Organization at the time of Gonzalez' trial, this claim must fail.

*Actual Conflict of Interest*

■ Where no *per se* conflict of interests exists, an attorney may still labor under an actual or potential conflict of interest that warrants a new trial. Under the Sixth Amendment, counsel is deemed ineffective if the defendant establishes that "a conflict of interest actually affected the adequacy of his representation." *Cuyler v. Sullivan* (1980) 446 U.S. 335, 348–49, 100 S.Ct. 1708, 64 L.Ed.2d 333; *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1242, 152 L.Ed.2d 291 (2002). While a defendant is generally required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel, *see Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, this is not so when counsel is burdened by an actual conflict of interest. *Id.* at 692, 104 S.Ct. 2052. Prejudice is presumed under such circumstances. *See id.; Cuyler*, 446 U.S.

at 350, 100 S.Ct. 1708; *Schwarz,* 283 F.3d at 95; *United States v. Jones,* 900 F.2d 512 (2d Cir.1990); *United States v. Malpiedi* (2d Cir.1995) 62 F.3d 465, 469. "An attorney has an actual, as opposed to a potential conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Winkler v. Keane* (2d Cir.1993) 7 F.3d 304, 307 (internal quotation marks omitted). In order to prevail on a claim that an attorney labored under an actual conflict, the defendant must demonstrate "(1) an actual conflict of interest that (2) adversely affected his counsel's performance." *Schwarz,* 283 F.3d at 91. Thus, in order to obtain relief, a defendant alleging an actual conflict of interest must show that the conflict of interest adversely affected counsel's performance. *Mickens,* 122 S.Ct. at 1244; *Winkler,* 7 F.3d at 309 (defendant must prove that " 'an actual lapse of representation' resulted from the conflict' ")(quoting *Cuyler,* 446 U.S. at 336, 100 S.Ct. 1708). To prove a lapse in representation, a defendant must show "that some plausible alternative defense strategy or tactic might have been pursued" but was not *and* that "the alternative defense was not inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler,* 7 F.3d at 309 (quotation marks and citations omitted). While this standard is less demanding than the *Strickland* prejudice prong, the defendant must nonetheless demonstrate that the attorney's representation was adversely affected or harmed. *See Mickens,* 122 S.Ct. at 1243–44. It is not sufficient for the defendant to simply argue an illusory or imagined effect on counsel's performance. *Id.* at 1243.

■ The defendant alleges that an actual conflict of interest existed as a result of Stiso's loyalty to Maisonet, whose interests, defendant claims, were adverse to defendant's. (Eisemann Decl. II ¶ 22–26, 115–119). For the reasons that follow, I find that Gonzalez has not shown that Stiso's loyalties were divided in such a way as to result in an actual conflict of interest. Moreover, were the defendant able to make out such a claim, he has not presented sufficient evidence to allow me to conclude that Stiso's representation of Gonzalez was adversely affected or harmed. That is, the defendant has failed to demonstrate that Stiso failed to pursue some plausible alternative defense strategy or tactic which was inherently in conflict with or not undertaken due to his other loyalties or interests. *See Winkler,* 7 F.3d at 309. Accordingly, the defendant's prayer for relief on the grounds that Stiso labored under an actual conflict of interest is denied.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. GONZALEZ' CONVICTION

1. Gonzalez and his co-defendant Colon were arrested on the evening of February 24, 1994, and subsequently indicted for possessing firearms after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). *See supra.*

2. Stiso was defendant's lawyer during the trial of this case. Stiso and Gonzalez first met sometime in 1993. (5/30/02 Tr. at 22). The two were introduced by Francisco Maisonet ("Maisonet"), when Maisonet, Gonzalez, and several others came with Maisonet to Stiso's office. (1/14/03 Tr. at 49). The defendant acknowledges that he retained Stiso on Maisonet's recommendation. (Eisemann Decl. II ¶ 22). Following Gonzalez' arrest in this case, he had a girlfriend contact Stiso through a third party. (5/20/02 Tr. at 22).

3. Both defendants appealed and their convictions were affirmed. As is pointed out *supra* page 8, in response to the defendants' challenges to the sufficiency of the evidence, the Second Circuit concluded that "We easily conclude that the evidence against both defendants was sufficient to support the jury's verdict." *United States v. Gonzalez* (2d Cir.1997) 110 F.3d 936, 941.

4. The Government cross-appealed from the sentence imposed on Gonzalez and the Court of Appeals remanded for this Court to make further findings and state reasons for any downward departure from the Sentencing Guidelines. *Gonzalez,* 110 F.3d at 948.

5. Shortly after the Court of Appeals' decision was rendered in April 1997, Gonzalez sought to have Stiso relieved as his counsel. In July 1997, the Court granted that application and appointed Stuart Holtzman, Esq., to represent Gonzalez. (Docket Entry No. 64).

## C. THE MAISONET ORGANIZATION

12. As early as 1988 and through 1999, Francisco Maisonet ("Maisonet") ran a racketeering enterprise (the "Maisonet Organization") that distributed illegal drugs at various locations in the Bronx. The Maisonet Organization also used violence as a means of furthering its unlawful goals. (Letter from the government to the Court of 1/27/00 at 4.)

13. Investigation of Maisonet and members of the Maisonet Organization began in approximately November 1996. (Stipulated Testimony of DEA Special Agent Robert Patterson ("Patterson Stip.") ¶ 1). During the course of the investigation, agents came to suspect that Stiso was criminally involved in the affairs of the organization. (*Id.*) In approximately January 1997, Agent Patterson began investigating Stiso's conduct. (*Id.*)

14. While no evidence has been submitted that details the precise nature and extent of the defendant's involvement in the Maisonet Organization, the government has conceded that it had "information that [the defendant] committed violent crimes with the Maisonet organization prior to his incarceration." (5/21/03 Tr. at 536).

15. In its submissions, the defense has relied on a pre-trial letter from the government to Judge Chin, the trial judge in *United States v. Francisco Maisonet et al.* (S.D.N.Y. filed August 8, 1997) 97 CR 817. (*See, e.g.,* Eisemann Decl. II ¶ 134 n.11). Of the information contained in the government's letter to Judge Chin relating to charged acts in *United States v. Francisco Maisonet,* one allegation which pertains to the murder of Oscar Hamilton ("Hamilton"), on or about November 16, 1993, is relevant to this case. The government informed Judge Chin that it believed that "Francisco Maisonet ordered the murder...Hamilton was shot by Esteban Gonzales [sic], a/k/a 'Stevie G,' a/k/a 'The Terminator,' a hitman used by Francisco Maisonet on more than one occasion and an associate of the Organization." (Letter from Assistant United States Attorneys Richard Sullivan, John M. Hillebrecht and Dani R. James to Judge Chin of 8/13/99 ("Gvt. Letter to Judge Chin" or "Def.'s Ex. V") at 2 ¶ 4). Of the information contained in the government's letter to Judge Chin relating to uncharged acts in *United States v. Francisco Maisonet,* two allegations are relevant to this case. The first allegation has to do with the murder of Louis Ayala. The government informed Judge Chin that it would seek to offer evidence that

> [o]n December 18, 1993, Ayala was shot to death in front of 1553 Watson Avenue. The Government *expects to prove* at trial that Ayala was engaged in an

ongoing 'turf battle' with a heroin distribution organization known as the 'Watson Avenue Family.' That battle led to a diminution in heroin sales by the Watson Avenue Family and a concomitant decline in Maisonet Organization revenues from the heroin the Organization was supplying the Watson Avenue Family. When certain of the leaders of the Watson Avenue Family decided that they wanted to have Ayala murdered, they approached Maisonet for someone to do the job. Maisonet supplied them with Esteban Gonzalez, a/k/a 'Stevie G,' a/k/a 'The Terminator,' who shot and killed Ayala.

(Gvt. Letter to Judge Chin at 3 ¶ 1)(emphasis supplied). The second allegation has to do with Stiso's representation of members of the Maisonet Organization:

> The Government also *expects to prove* at trial that co-racketeer Pat V. Stiso was regularly employed by Francisco Maisonet to represent Maisonet Organization associates who Maisonet feared might cooperate with the Government. Stiso's representation of those individuals was designed by Maisonet to forestall any such cooperation. A portion of such conduct involving Stiso's representation of Jose Vasquez was charged as Predicate Act 5 in the s4 97 CR 817 indictment. In addition to Stiso's representation of Vasquez, the Government *intends to prove* that at various times Stiso represented Esteban Gonzalez (a Maisonet

hitman, involved in the murders of Oscar Hamilton and Louis Ayala) in connection with his 1994 prosecution for weapons possession, Richard Castellano (a narcotics dealer involved in the conspiracy to murder Louis Ayala and the conspiracy to murder Gregorio Delacruz), a number of Francisco Maisonet's co-defendants, and others.[8]

(Gvt.'s Letter to Judge Chin at 4 ¶ 3)(emphasis supplied)[9].

16. The purpose of this letter was to "apprise the Court and counsel of further details relating to certain acts charged in the Indictment and of evidence that the Government will offer during trial concerning certain uncharged crimes committed by the defendants and their co-racketeers." (Gvt.'s Letter to Judge Chin at 1). The second purpose of the Gvt.'s Letter to Judge Chin was to argue for the admissibility of evidence of uncharged crimes the government hoped to offer at trial. (*Id.* at 5). Regarding the information relating to certain charged acts, the government informed the Court that the letter set forth what the government *expects* "the evidence will show...[and that it] is based on information currently on hand, and may change as additional evidence is gathered." (*Id.*). I find it significant that this letter contains only allegations that the government hoped to—or believed it would be able to—prove. While the letter's contents precludes the government from now claiming that it never believed that Gonzalez com-

---

**8.** Richard Castellano ("Castellano") testified at the evidentiary hearing about the murder of Louis Ayala. (2/8/01 Tr. at 60–62). His testimony, while largely hearsay, comports with the government's allegations in the Gvt.'s Letter to Judge Chin (*Id.* at 3 ¶ 1).

**9.** The defense disingenuously characterizes this paragraph as stating that the government believed Stiso's representation of Gonzalez to be one of a class of representation in which Maisonet employed Stiso to forestall coopera-

tion by certain associates. (Def.'s Proposed Findings of Fact and Conclusions of Law ( "Def.'s Prop'd Findings") ¶ 142). The plain language of the paragraph belies such an interpretation. The fourth sentence, which is structurally independent from the first sentence—the sentence which deals with the government's belief that Stiso was used to dissuade potential cooperators—simply lists the names of individuals, including the defendant, who were represented by Stiso.

mitted crimes on behalf of Maisonet, it does not, on the other hand, bind the government to the precise allegations outlined, pre-trial, for Judge Chin.[10] It also is not sufficient to meet the defense's burden of proving the elements necessary to his case by a preponderance of the evidence. The letter's evidentiary value in this case is thus limited to showing what the government believed it could prove in 1999; it does not go to the truthfulness of the allegations contained therein. The evidentiary value of the information relating to uncharged crimes is even less weighty than that of the information pertaining to charged crimes given that the government itself did not believe it had sufficient evidence or cause to prosecute those crimes.

17. Similarly, the defendant relies upon the Affidavit of Robert Patterson, Special Agent, Drug Enforcement Administration, in Support of an Order Authorizing the Interception of Wire Communications over Certain Telephones, sworn to on April 28, 1997 ("Patterson Aff.") to support various claims about allegedly illegal acts in which Stiso engaged in furtherance of the Maisonet Organization's illegal goals. (*See, e.g.,* Def.'s Prop'd Findings ¶¶ 10, 30). Like the government's letter to Judge Chin, this affidavit has limited evidentiary value as the allegations the defendant would like for it to stand have not been proven in this Court. More to the point, the parties offered in evidence a stipulation setting forth that, if called as a witness, Agent Patterson would testify only to the following: (1) the length of time of the investigation of Maisonet and Stiso,; (2) Agent Patterson's familiarity with all the evidence and leads generated during the investigation; and (3) that despite the investigation, no evi-

dence of Stiso's involvement in narcotics trafficking or money laundering on behalf of or in connection with Francisco Maisonet or other members of the Maisonet Organization prior to the Fall of 1996 was uncovered by the government. (Patterson Stip. ¶¶ 1–3). Presumably, were evidence available to support the claims in Patterson's wiretap affidavit, Agent Patterson would have stipulated to (or testified) to that. Accordingly, the claims in the affirmation which are neither supported by evidence nor stipulated to by Agent Patterson have no bearing on my decision here.

18. The defense has alleged that Gonzalez' illegal acts on the night of February 24, 1994 (i.e., the underlying crime for which he was convicted in this case) were undertaken on behalf of Maisonet. (Eisemann Decl. II ¶¶ 16–21). Specifically, the defendant has alleged that he was in the area where he was arrested to conduct a heroin deal on behalf of Maisonet with a man named Salvatore Atria, a local resident who was a tenant in the home owned by George Mascia. (*Id.* ¶ 18).

The defense has alleged that Gonzalez' illegal acts on the night of February 24, 1994 (i.e., the underlying crime for which he was convicted in this case) were undertaken on behalf of Maisonet. (Eisemann Decl. II ¶¶ 16–21). Specifically, the defendant has alleged that he was in the area where he was arrested to conduct a heroin deal on behalf of Maisonet with a man named Salvatore Atria, a local resident who was a tenant in the home owned by George Mascia. (*Id.* ¶ 18).

However, no credible evidence has been offered to support this claim. In fact, only one witness, Richard Castellano ("Castella-

---

10. It is ironic that the defense chooses to rely on this document to prove its case. One need only imagine the fatal consequences for criminal defendants were government statements about allegations it believes it could prove or would like to prove were accepted, without more, as true.

no"), testified that the crime underlying Gonzalez' conviction had any possible connection to Maisonet.

Castellano was an overseer of another drug ring, the Waston Avenue Organization. He took drugs on "consignment" for resale from Maisonet. (2/8/01 Tr. at 7). He testified that Maisonet "said that he was loaning [the defendant] $25,000 because Mr. Gonzalez wanted to go on his own to sell drugs, to buy drugs on his own to sell." (*Id.* at 63). In answer to questions on direct, Castellano said that Maisonet told him that Gonzalez was arrested on a drug deal that "went bad[ ] and he got into a shootout with the police officers." (*Id.* at 17). The defendant urges that the drug deal was related to the loan.

Besides the fact that much of the testimony is hearsay, it hardly supports the contention that Gonzalez' illegal activity on the night of February 24, 1994 was undertaken on behalf of Maisonet. Even if Maisonet did loan Gonzalez $25,000, this fails to support the argument that the events of February 24, 1994 were Maisonet directed or controlled events.

There is no evidence in the record to support the claim that Gonzalez was acting on Maisonet's behalf or as a member of the Maisonet Organization on February 24, 1994. On the other hand, George Mascia ("Mascia"), the owner of the house that was the subject of an attempted burglary on February 24, 1994, offered testimony that, in contradiction to the version of events on that night offered by the defense, he had never seen Gonzalez in Atria's apartment or at Mascia's house on the night of, or prior to, the night of the attempted break in. (5/21/03 Tr. at 397). Mascia's testimony is uncontradicted.

19. When questioned about his general involvement in the Maisonet Organization as well as the connection between his illegal activities on the night of February 24, 1994 and the Maisonet Organization, the defendant invoked the Fifth Amendment to the United States Constitution and refused to answer. This is his right as a criminal defendant and he cannot—and will not—be penalized for invoking it. However, it is well-established that a defendant may not use the privilege as both a sword and a shield. On the admissible evidence regarding the defendant's involvement in the Maisonet Organization generally, I can only take notice of that which is undisputed by the parties: that the defendant committed violent acts on behalf of the Organization at some point prior to his trial in this case. The defendant has not produced any admissible evidence to support his allegation that the crime underlying his conviction in this case was committed on behalf of Maisonet or to further the unlawful goals of the Maisonet Organization.

## D. STISO'S CONVICTION

20. On August 12, 1998, Stiso pled guilty to a fourcount Superseding Information, S5 97 Cr. 817(DC), filed in this district. (Gvt. Ex. 3501–H ("Stiso Plea Transcript")). In the information, the United States Attorney charged that, from approximately October 1996 through and including approximately August 1997, Stiso did knowingly combine, conspire, confederate and agree together to violate the narcotics laws of the United States. (Gvt. Ex. 3501–F ("Information") ¶ 1).

21. The charges against Stiso arose from the aforementioned investigation by the Government into the Maisonet Organization. *See supra* ¶ 13. The government's investigation of Stiso was thorough and wide-ranging. Government agents obtained and reviewed: (1) documents and other demonstrative evidence recovered through searches and provided in response to subpoenas; (2) statements made during

interviews of numerous witnesses and potential witnesses, including a number of members of the Maisonet Organization; and (3) voluminous recorded conversations obtained through Court-authorized wiretaps of telephones and office space used by Stiso. (Patterson Stip. ¶ 2). Nonetheless, this investigation failed to produce any evidence that Stiso was involved in narcotics trafficking or money laundering on behalf of or in connection with Fransisco Maisonet or other members of the Maisonet Organization prior to the Fall of 1996. (*Id.* ¶ 3).

22. Although three of the four counts to which Stiso pled guilty involved criminal conduct related to Fransisco Maisonet, all of the charged conduct occurred nearly two years after Gonzalez' trial. Moreover, the Government's investigation yielded no evidence of uncharged criminal participation by Stiso in the Maisonet Organization's narcotics trafficking activity prior to the Fall of 1996. Accordingly, there is no evidence resulting from the charges against Stiso or other fruits of the Government's investigation, that Stiso was criminally involved in the crimes for which Gonzalez was charged or otherwise criminally involved with the Maisonet Organization before or during Gonzalez' trial.

23. The defendant seeks to have this Court make various findings regarding Stiso's mental state, including the following: that "[d]uring the time that he was close to Maisonet, Stiso had several psychological issues that made him susceptible to committing illegal acts not only on behalf of Maisonet but his other clients as well"; that "Stiso had a textbook case of patho-

logical gambling disorder"; that "Stiso had a subclinical depression for many years, which was accompanied by a strong need for punishment"; that "Stiso's psychological problems caused him to exercise extremely poor judgment and to commit criminal acts in an effort to gain approval from his clients. They also caused him to have a persistent denial of the dangers he subjected himself to by such actions..." (Def.'s Prop'd Findings ¶¶ 13–18). The defendant further requests that this Court "independently find" that "[u]nderneath [Stiso's] bravado was a man who would do almost anything for his clients if they would praise him." (*Id.* ¶ 19). Finally, the defendant would like the Court to conclude that "[t]hese psychological syndromes were affecting Stiso's behavior as early as 1992...[and that] Stiso's psychological issues caused him to begin committing criminal acts to please Maisonet as early as 1992." (*Id.* ¶ 20).

24. The Court declines to make any such findings. There was no testimony from a mental health expert regarding Stiso's mental condition. In the absence of such testimony or any other admissible evidence which offers support for these claims, there is no basis for any determination regarding Stiso's mental condition.[11]

**E. OTHER ALLEGED CRIMINAL CONDUCT BY STISO**

25. Although the Government, despite an intensive investigation, failed to obtain evidence that Stiso was criminally involved with Maisonet during the time of Gonzalez' trial, Gonzalez points to a number of al-

---

**11.** On cross-examination, Mr. Eisemann asked Stiso whether he agreed with various findings contained in a report of Dr. Leonard Feinberg, a psychiatrist retained by Stiso. (3/18/03 Tr. at 253–257). This report was not introduced in evidence. However, in Stiso's Pre–Sentence Report, which quotes extensive-

ly from this report, it is noted that Dr. Feinberg cautioned that "...a number of the hypothesized dynamics described in the report will require several years of intensive psychotherapy for verification." (Gvt. Ex. 3501–I ("Stiso PSR") ¶ 128).

leged criminal acts in which Stiso purportedly participated on behalf of Fransisco Maisonet. Principal among these alleged acts are: (1) Stiso's alleged involvement in the bribing of a juror in a state criminal trial against Maisonet in 1993; (2) Stiso's alleged involvement in misleading a judge in state court in May 1993 about the true name and identity of a Maisonet associate named Miguel Rodriguez to obtain bail for Rodriguez; and (3) various efforts to dissuade members of the Maisonet Organization from cooperating with the Government. (Eisemann Decl. II ¶¶ 8–10, 13–14).[12]

26. As detailed more fully below, Gonzalez has failed to carry his burden of proving by a preponderance of the evidence that Stiso was criminally involved in bribing a state court juror or misleading a state court about the identity of Miguel Rodriguez or engaging in other conduct of a criminal nature which requires action on this motion.[13]

#### (a) The Juror Bribery Allegation

27. There is no dispute that Stiso represented Maisonet in connection with assault charges that went to trial in New York State Supreme Court, Bronx County, in the Fall of 1992. There is also no dispute that Maisonet was acquitted of those charges. Two witnesses called by Gonzalez testified that they were told by Maisonet that one of the jurors selected for the case was bribed. The first witness, Ramon Torres, testified that he was present in the courtroom when "Nolo" (whose real name is Angel Flores), one of Maisonet's associates, recognized one of the potential jurors as a woman that Nolo had dated. (12/15/00 Tr. at 22–24).[14] Torres testified that he was present later in the day, after the woman was empanelled on the jury, when Maisonet and Flores discussed a plan to bribe the juror. (Id. at 26–27). Torres further testified that Stiso was not present for this conversation (Id. at 26, 66–67), and that Torres had no direct knowledge of whether Maisonet in fact bribed the juror. (Id. at 67–68). Torres also recounted a conversation at a party the night after Maisonet's acquittal during which Stiso asked Maisonet, in substance "you took care of that. Frank said, don't worry about it, we hit her off already." (Id. at 30). Torres could not recall the exact words used in that exchange (Id. at 30–31). Torres also admitted that although he believed this exchange between Stiso and Maisonet concerned the juror, nothing was said which made that fact explicit and Torres was instead inferring the meaning of the exchange. (Id. at 70–71).[15] Another per-

12. Although Gonzalez' petition claims that Stiso also participated in bribing a witness at Maisonet's 1993 assault trial, no evidence was introduced to support this claim. (See 2/8/01 Tr. at 46; 1/14/03 Tr. at 158–163). Similarly, no admissible evidence was submitted to support the defense claim that Stiso gave Maisonet the name and address of the victim of the 1993 assault. (See 2/8/01 Tr. at 47–49; 1/14/03 Tr. at 158–163).

13. Gonzalez also alleges various intentional acts by Stiso furthering the unlawful goals of the Maisonet Organization that occurred in the years after Stiso represented Gonzalez. Even if credited, these allegations cannot support the defendant's claims of conflict of interest or ineffective assistance of council and, accordingly, need not be ruled upon by the Court.

14. Torres explained that he was engaged in narcotics trafficking and two murders as one of the leaders of the "Willis Avenue Lynch Mob," a racketeering enterprise similar to the Maisonet Organization, for which Torres is now serving a 17 year sentence. (Id. at 13–15, 32–38).

15. Torres also testified about an incident in the Summer or Fall of 1994 when Stiso visited Torres who was then in custody on federal charges. Torres explained that he believed

son who was present for this exchange between Stiso and Maisonet, Richard Castellano, knew of the plan to pay the juror (2/8/01 Tr. at 46) but did not draw any inference that Stiso and Maisonet were talking about the juror. (2/8/01 Tr. at 50–52).

28. In addition to Ramon Torres, the Court heard testimony about the bribery of the juror from Angel Flores, another close associate of Maisonet, who is currently serving a 30 year term of imprisonment for narcotics trafficking and murder. (2/8/01 Tr. at 93–95). In contradiction to Torres, Flores testified that he did not speak with Torres about the plan to bribe the juror and did not believe that Torres was present when Flores mentioned to Maisonet that Flores knew the juror. (Id. at 110). This contradiction is significant. It further undermines the contention that Stiso had any knowledge of or participation in the juror bribing scheme.[16] Flores testified that he believed Stiso overheard Flores telling Maisonet that Flores knew the juror and would try to "holler" at her, but that Stiso was unaware of the efforts to bribe the juror. (Id. at 111). Flores did not recall hearing the conversation, described by Torres, after the trial in which Stiso purportedly asked Maisonet if the woman had been taken care of. (Id. at 112).

29. Stiso testified that he did not know, until well after the trial, that Maisonet had bribed a juror in the 1993 state trial. Stiso testified that Maisonet told him about the bribing of the juror at a point in time when their relationship had deteriorated and Maisonet was attempting to belittle Stiso's skills as a trial lawyer. (1/14/03 Tr. at 145–46).

30. There is insufficient evidence to find that Stiso knew of or participated in the plan to bribe the juror. No witness testified that Stiso participated in or overheard any conversation about a plan to bribe the juror.

### (b) Miguel Rodriguez' Bail

31. As noted above, *supra* ¶ 25, Gonzalez claims that Stiso unlawfully, and on behalf of the Maisonet Organization, misled a state court in May 1993. Gonzalez' claim relates to an arrest of Miguel Rodriguez, a Maisonet associate, on or about May 13, 1993. (Eisemann Decl. II ¶ 13).[17] Gonzalez claims that when Rodriguez was arrested, Rodriguez gave the police an alias, "Rueben Santana," to avoid being detained for violation of Rodriguez' state parole. Gonzalez claims that Stiso falsely stated to the arraignment judge that his client had no record and therefore deserved bail, when Stiso knew that his client's true name was Miguel Rodriguez, that Rodriguez did have a record, and that there was a warrant out for Rodriguez'

---

the purpose of Stiso's visit was to determine, on behalf of Maisonet, if Torres was cooperating or considering cooperating with the Government. (Id. at 38–49). Torres admitted that his own lawyer was aware of Stiso's visit and that Stiso never threatened Torres. (Id. at 39–40; 82). There was nothing inappropriate, much less criminal, in Stiso's actions, even if Torres' speculation about Stiso's motives during that visit *is correct*. A lawyer *is* free to talk to potential witnesses against his or her clients to determine what if any testimony they might give against his or clients.

16. As I explained at the hearing, I found Mr. Torres "credible in that I [thought] he was doing his best to tell the truth...[but that] I may think he failed to tell the truth but...not because I don't think he is truthful." (12/15/00 Tr. at 93).

17. Gonzalez failed to offer in evidence any records from the state court relating to this arrest.

arrest (under his lawful name) for a parole violation.

32. The government maintains that, even if Stiso failed to disclose Rodriguez' true identity at the bail hearing, Gonzalez has "failed to demonstrate how such conduct by Stiso would amount to a crime rather than appropriate advocacy." (Gvt.'s Proposed Findings of Fact and Conclusions of Law ("Gvt.'s Prop'd Findings") ¶ 20). The government even goes so far as to assert that "[a]s Rodrguez' lawyer, Stiso was under no duty to reveal his client's true identity to the state or to insure that the state was aware that Rodriguez was on parole. Indeed it might well have been a violation of Stiso's ethical obligations to do so." (*Id.*) The Court expressly rejects this position. It is both an ethical and a criminal violation for an attorney to lie to a court about his or her client's true identity for the purpose of assisting that client in fraudulently securing bail. Rule 3.3(a) of the American Bar Association's Model Rules of Professional Conduct provides in part that "A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client . . ." (Model Rules of Prof'l Conduct R.3.3(a)). Rule 3.3(b) provides that a lawyer's duty of candor under subparagraph (a) applies "even if compliance requires disclosure of information otherwise protected by Rule 1.6." (Model Rules of Prof'l Conduct R.3.3(b)). *See e.g., People v. Casey* (Colo. 1997) 948 P.2d 1014 (forty-five-day suspension warranted for lawyer who failed to inform court that client facing trespassing charge was using someone else's identity; duty of candor applies even if it requires disclosure of otherwise confidential information).

33. In his testimony before this Court, Stiso credibly denied knowing at the time that Rodriguez was on parole, that he had a criminal record, or that Rodriguez used the alias to avoid being detained for a parole violation. (3/18/03 Tr. at 258–68). As Stiso explained, there would be little reason to expect such a ploy to be successful since the state, through fingerprint matching, can quickly determine if a person has a criminal record under another name. (*Id.* at 263).

34. Accordingly, this incident provides no support for Gonzalez' claim that Stiso was criminally involved in the Maisonet Organization's affairs during or before Gonzalez' trial.

### (c) Other Alleged Criminal Conduct

35. Gonzalez raises a host of other claims that Stiso went to great lengths to persuade or threaten other clients not to cooperate with the Government in order to protect Maisonet. Because all of these incidents post-date Gonzalez' trial, they can not support his claim that Stiso was criminally involved in the Maisonet Organization's affairs during or before Gonzalez' trial. (See, e.g., Defense Exhibit B (Stipulated Testimony of "Witness A"); Defense Exhibit D (Stipulated Testimony of "Witness D"); Defense Exhibit F (Stipulated Testimony of Edwin Garcia)).

36. Gonzalez further claims that Stiso regularly informed Maisonet about the identities of individuals who were cooperating. Here too, Gonzalez has failed to show that the conduct, even if credited, demonstrates that Stiso was criminally involved in the Maisonet Organization's affairs during or before Gonzalez' trial. Nearly all of the incidents presented by Gonzalez post-date Gonzalez' trial. (See, e.g., Defense Exhibit B (Stipulated Testimony of "Witness A"), ¶ 3; Defense Exhibit C (Stipulated Testimony of "Witness

B"); Defense Exhibit E (Stipulated Testimony of Vanessa Garcia); Defense Exhibit F ("Stipulated Testimony of Edwin Ortiz") ¶¶ 4–5). Moreover, absent a specific court order, as was the case with respect to the conduct for which Stiso was convicted, there is nothing criminal about a lawyer disclosing to a client the identity of Government witnesses. Indeed, it is proper for a lawyer to do so.

37. The defense also focuses on loans made by Maisonet to Stiso. There is no dispute that Maisonet loaned Stiso a total of $100,000—one loan of $50,000 in late 1993 and one loan of $50,000 in July or August 1995. (Def.'s Proposed Findings ¶¶ 8–9; 1/14/03 Tr. at 46–47, 247–48; Gvt. Ex. 3501–GG). In order to secure the first loan, Stiso falsely told Maisonet that he had lost money in the stock market when he really had gambling debts to pay. (1/14/03 Tr. at 46, 248). In order to secure the second loan, Stiso falsely told Maisonet that another person wished to borrow the money, when in actuality, Stiso himself needed the money to repay his gambling debts. (*Id.* at 47, 248). According to Stiso, this latter loan was repaid by him at a rate of $1500 per month. (*Id.* at 248). There has been no allegation that the acceptance of these loans by Stiso constitutes a criminal act, nor has there been an allegation that the acceptance of these loans constitutes an act in furtherance of the illegal activities of the Maisonet Organization. Gonzalez has failed to show that the conduct demonstrates that Stiso was criminally involved in the Maisonet Organization's affairs during or before Gonzalez' trial.

38. Gonzalez has failed to demonstrate that Stiso was criminally involved in the Maisonet Organization's affairs during or before Gonzalez' trial. Additionally, Gonzalez has failed to show that the criminal conduct for which he was arrested was related in any way to Francisco Maisonet or the activities of the Maisonet Organization.

## F. GONZALEZ' CLAIMS OF INEFFECTIVE ASSISTANCE

39. Although Gonzalez' claim that Stiso was criminally involved in the Maisonet Organization at the relevant time fails, his claim that Stiso nonetheless suffered from an actual conflict of interest must be considered. Gonzalez claims that Stiso had an actual conflict of interest because Stiso's real loyalties ran to Fransisco Maisonet. Gonzalez claims that as a consequence Stiso provided ineffective assistance. Second, Gonzalez claims that Stiso failed to pursue certain trial strategies that Gonzalez advocated. The evidence, as set forth more fully below, fails to support these contentions.

44. Gonzalez claims that Stiso failed to adequately advise him of the sentence he likely faced pursuant to a plea agreement. Gonzalez claims that Stiso told him that, if he pleaded guilty, he would receive the statutory maximum applicable to a violation of 18 U.S.C. § 922(g) of ten years imprisonment. The defense alleges that: "[t]he government had offered a plea bargain in which defendant would plead guilty in return for the government's agreement to withdraw the previously-filed prior felony information, the effect of which was to enhance defendant's sentence pursuant to 18 U.S.C. 924(e). The resulting sentence, under the guidelines, would have been a minimum recommended term of imprisonment of 70 months." (Def.'s Prop'd Findings ¶ 148) (citing testimony of defendant). No evidence has been presented to support the claim that the government was prepared to enter into such a plea bargain. In fact, the government explicitly denies that any such plea offer was ever made by the government. (Letter from Owens to

the Court of 1/27/00 at 6). The Court credits the government's denial that the plea offer was ever made.[18] Given that no plea offer was ever made, any alleged advice by counsel regarding that agreement—erroneous or not—cannot form the basis of an ineffective assistance of counsel claim.

45. Gonzalez also claims that Stiso failed to adequately advise him of the sentence he likely faced in the event of a conviction at trial. In order to establish ineffective assistance of counsel in this context, a criminal defendant has the burden of showing both that the advice he received concerning the alternatives relevant to the decision to plead guilty or go to trial fell below an objective standard of reasonableness and that he suffered prejudice as a result. To establish prejudice, the defendant must establish a reasonable probability that, if he had been given complete and accurate, he would have pled guilty instead of going to trial. *See Aeid v. Bennett* (2d Cir.2002) 296 F.3d 58, 62. Gonzalez claims that Stiso told him that if he went to trial and lost, the minimum sentence would be increased to only fifteen years. Gonzalez claims that, in addition, Stiso never explained the sentencing guidelines or the plea process to him. Gonzalez: 26–27. This claim is not sufficiently supported. Stiso testified that he advised Gonzalez that he faced a mandatory minimum sentence of 15 years and, if he lost at trial, the sentence could range from 20 to 30 years. (1/14/03 Tr. at 53). Stiso further testified that, although the Government never made a formal plea offer, Gonzalez stated that he would not be interested in pleading guilty even if the offer were as low as seven years. (*Id.* at 53–54). The Court concludes that Gonzalez has met neither prong of the ineffectiveness standard. Moreover, in view of Stiso's testimony, and Gonzalez' legal sophistication, as demonstrated directly by Gonzalez in his testimony and communications with the Court over the last nine years (*see, e.g.,* 5/30/02 Tr. at 123–26), Gonzalez' claim that he did not understand what his likely sentence would be rings hollow.

46. Gonzalez raises a host of other claims of ineffectiveness with respect to trial strategy. Notably, however, none of those claims bear any logical relation to Stiso's alleged conflict of interest. While it is at least plausible that, if Stiso's primary concern was to protect Maisonet, Stiso would be motivated to dissuade Gonzalez from cooperating, the same cannot be said for Gonzalez' other claims. If Stiso were motivated to protect Maisonet against the possibility that Gonzalez might cooperate, the best strategy would be to vigorously defend Gonzalez' case at trial and win an acquittal. Only by means of an acquittal of Gonzalez could Stiso assure Maisonet that Gonzalez would have no incentive to cooperate. In that respect, Maisonet and Gonzalez' interests were perfectly aligned. Viewed from this perspective, none of Gonzalez' remaining claims of ineffective assistance pass muster.

47. Principal among those claims is Gonzalez' assertion that Stiso persuaded one Government witness, George Mascia ("Mascia"), to commit perjury at trial.

---

**18.** Moreover, the·defendant's allegation that the resulting sentence, had the government withdrawn the prior felony information, would have been 70 months, is legally incorrect. In such a situation, Gonzalez' base offense level would have been level 24 under 2K2.1(a)(2). An additional two levels would have been added under 2K2.1(b)(4) because one of the firearms had been stolen, resulting in a base offense level of 26. Finally, given that Gonzalez' criminal history yielded a total of 18 criminal history points, for a criminal history category of VI, the resulting Guidelines range would have been 120 to 150 months.

Mascia's home, located near where Detective Crowe first noticed the defendant on the night of his arrest, was the subject of an attempted burglary that night. *See United States v. Gonzalez* (2d Cir.1997) 110 F.3d 936, 941. It has been the government's theory that Gonzalez, his brother, and Colon had tried to burgle Mascia's home the night they were arrested, February 24, 1994. (*Id.*) The defense claims that there was no attempted burglary, but rather that Gonzalez had gone to the Mascia residence to conduct a drug deal on behalf of Maisonet with Salvatore Atria ("Atria"), a tenant of Mascia's. (Eisemann Decl. II ¶¶ 16–21). According to the defense, in negotiating the deal with Atria on Maisonet's behalf, Gonzalez had been to Atria's apartment on various occasions. (*Id.; see also* 5/30/02 Tr. at 75). It was through these visits that Mascia came to know Gonzalez and so should have recognized Gonzalez at trial and at this hearing. Gonzalez alleges that Stiso asked Masca to perjure himself and state that he did not recognize Gonzalez because Stiso feared that if Mascia said he recognized Gonzalez, it would lead to further investigation of Mascia's tenant, Atria, which in turn would lead to Maisonet. (5/30/02 Tr. at 76). The claim is far too attenuated to credit. The Government's only inquiry was whether Mascia recognized Gonzalez as the burglar that night. Neither Stiso, nor the Government for that matter, would have found a positive identification by Mascia as grounds for further investigation of Atria. Moreover, Gonzalez' interests and Maisonet's interests on this score were perfectly aligned. In addition, even if the Court credited Gonzalez' version of the events of February 24, further investigation into Atria would have revealed as much about Gonzalez' involvement in heroin trafficking

with Mascia as Maisonet's. Specifically, Gonzalez claims that Stiso persuaded Mascia to falsely state that Mascia did not recognize Gonzalez when, according to Gonzalez, Mascia knew Gonzalez. (5/30/02 Tr. at 75–76). Gonzalez' claims are specious. First, both Stiso and Mascia deny Stiso ever asked Mascia to lie at trial. (1/14/03 Tr. 64–68; 4/21/03 Tr. at 396–97). While the defense has offered theories that suggest that Mascia had reason to lie, no supporting evidence has been introduced. I can find no reason to believe that Mascia, a neutral and uninvolved party, would have reason to perjure himself at this hearing or at trial. Moreover, as Stiso explained, Mascia's inability to recognize the defendant as the person who broke into his house on February 24, 1994, was helpful to Gonzalez' defense. (1/14/03 Tr. at 68). If Mascia had been able to identify Gonzalez at trial it would have been damaging testimony that would have corroborated Detective Crowe's claim that Gonzalez had been at the scene that night.[19] Indeed, Gonzalez' testimony that Stiso claimed to have persuaded Mascia to commit perjury is so specious that it casts grave doubt on Gonzalez' entire testimony.

48. Gonzalez' claim that Stiso was ineffective for failing to cross examine Mascia about purported book-making activity is similarly specious. As Stiso explained, Mascia's inability to identify Gonzalez was helpful to the defense case and there was therefore little reason for Stiso to impeach Mascia's trial testimony. (1/14/03 Tr. at 69). Gonzalez claims that he provided Stiso with telephone records for the phone in Mascia's basement apartment showing calls to sports-betting numbers. (7/11/02 Tr. at 73–74; 165). Gonzalez has failed to demonstrate, however, that the phone bills he offered in support of that claim at the

---

19. Gonzalez was not arrested at the scene (Trial Tr. at 244–48) and the primary evidence

linking Gonzalez to the scene was Officer Crowe's testimony.

hearing, which were missing the cover page showing the billing information, in fact pertain to the phone in Mascia's basement.

49. In his testimony, Gonzalez presented a laundry-list of other purported failings by Stiso, such as (1) Stiso's argument to the jury that Crowe planted the guns recovered at the scene (5/30/02 Tr. at 65–66)[20]; (2) Stiso's failure to have Gonzalez' clothing tested for gunpowder residue (*Id.* at 66–67); and (3) the decision to agree to a stipulation of AUSA Jeremy Temkin's testimony rather than calling Temkin as a witness (*Id.* at 80–81). These decisions, however, fall well within the range of reasonable trial strategy and tactics committed to the judgment of counsel and do not rise to the level of ineffective assistance. Moreover, as noted above, there is no showing that Stiso's decisions on these matters were, or even could have been, influenced by any conflict of interest involving Maisonet.

50. The record here does not support the invocation of the *per se* rule set forth in *Fulton.* Stiso's criminal conduct was temporally and factually distinct from that of Gonzalez. There was no evidence that Stiso was involved in the events for which Gonzalez was tried and convicted, namely the defendant's unlawful possession of a weapon on the evening of February 24, 1994. At best, Gonzalez contends that Stiso and Gonzalez were both involved in separate criminal activity with Fransisco Maisonet. Even if this were enough to invoke the *per se* rule, a matter the Court need not decide, Gonzalez, as set forth above, has not demonstrated that Stiso and Gonzalez were involved in criminal activity with Maisonet during the relevant

period, namely before and during Gonzalez' trial.

51. Although the *per se* rule does not apply, the question remains whether Stiso labored under an actual or potential conflict of interest that warrants a new trial. Gonzalez has failed to meet the standard articulated in *Mickens.* Moreover, even if Stiso did not advise Gonzalez about cooperation, Gonzalez was later presented with the opportunity to cooperate while being represented by unconflicted counsel and it is undisputed that he then, again, chose not to cooperate. It can hardly be said that, at the end of the day, a plausible alternative was "not undertaken *due to* the attorney's other loyalties or interests." *Winkler v. Keane,* 7 F.3d at 309.

52. Gonzalez' other claimed lapses in Stiso's representation fail for the same reasons. With respect to the claims concerning George Mascia, the evidence flatly contradicts Gonzalez' claim that Stiso persuaded Mascia to testify falsely or that Mascia did testify falsely. Mascia's inability to identify Gonzalez was helpful to Gonzalez' defense. If Mascia had identified Gonzalez during trial, that identification would only have corroborated Crowe's testimony and further linked Gonzalez to the unauthorized entry into Mascia's house that evening. For the same reasons, it would have made no sense to impeach Mascia by using Atria's phone records (if in fact the proffered records relate to Atria's phone) to suggest that Mascia was a bookmaker in light of the fact that Mascia failure to identify Gonzalez was helpful to Gonzalez' defense.

53. With respect to Gonzalez' other claims of ineffectiveness, they bear no logical relationship to Stiso's alleged divided

---

**20.** Gonzalez describes this defense as "incredible" and faults Stiso for presenting it. However, in arguing for the release of various documents relating to Crowe, Gonzalez makes essentially the same argument: that Crowe had fabricated charges against other criminal defendants as he fabricated charges against the defendant.

loyalties between Gonzalez and Maisonet. There is no evidence to show that, for example, Stiso failed to hire experts or conduct gunpowder residue tests on Gonzalez' clothing in order to protect Maisonet, or that Stiso stipulated to the testimony of Jeremy Temkin, rather than calling Temkin to the stand, in order to protect Maisonet. These and other tactical decisions of which Gonzalez now complains fell well within the range of reasonable trial strategy and in now way fell below the *Strickland* standard of "objective reasonableness."

## CONCLUSION

54. On the findings of fact and conclusions of law set forth above, defendant's application to vacate his conviction on the grounds of an alleged conflict of interest with his trial counsel is DENIED.

SO ORDERED